UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JOHN DOE, | ) Index No. 1:20-00008 (LEK/ATB) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) **COMPLAINT** |
| | ) |
| | ) |
| SKIDMORE COLLEGE, | ) |
| | ) |
| Defendant(s). | ) **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| | ) |
| | ) |

Plaintiff John Doe ("John Doe" or "Plaintiff"—a pseudonym), by his attorneys,
The Kaplan Law Office of New York New York, for his complaint against defendant
Skidmore College ("Skidmore" or "Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action in which Plaintiff seeks damages for injuries sustained as
a result of the Defendant's violation of his rights as secured by Title IX of the Education
Amendments of 1972.  Plaintiff also sues in contract pursuant to pendent State claims.
Plaintiff seeks damages and injunctive relief from the unlawful actions taken and
procedures employed by Defendant and its agents that resulted in a wrongful three-year
suspension of Plaintiff during his graduating semester, with an additional concurrent year
of suspension for an undated incident that allegedly took place during his freshman year.
This three-year suspension was the result of a rigged and unfair disciplinary process put
in place to reach a pre-determined gender biased result with deliberate disregard for the
consequences to Plaintiff, in violation of both state and federal law.  As a direct result of

Skidmore's gender discrimination and hostile education environment in violation of the requirements of Title IX of the Education Amendments of 1972 and applicable State law, as well as a breach of Skidmore's own codes and policies, Plaintiff has suffered severe emotional distress and damage to his reputation.  Moreover, Plaintiff has been accepted to begin a master's program at a prestigious university which began August 2019 and the opportunity will be lost as a result of Skidmore's actions jeopardizing his career path and future income.  Plaintiff seeks damages, compensatory and punitive, equitable relief, an award of costs and attorney's fees and such other and further relief as this Court deems equitable and just.

## <u>JURISDICTION</u>

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343, 1343(a)(3) and (4), as Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20  U.S.C. §§ 1681-88.

3.      Any claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202 and Rules 57 and 65(a) of the Federal Rules of Civil Procedure.

4.      The Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a) over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy.  Jurisdiction of this court for the pendent claims is authorized by F. R. Civ. P. 18(a) and arises under the doctrine of pendent jurisdiction.

5.      The Plaintiff respectfully demands a trial by jury on each and every one of the claims as pleaded herein.

## VENUE

6.      Venue is proper for the United States District Court for the Northern District of New York pursuant to 28 U.S.C. §1391(a), (b) and (c) and §1402 (b) because the claims arose in this district.

## PARTIES

7.      Plaintiff resides in Washington, D.C.  and was a full-time student at Skidmore College in the 2015-2019 academic years.

8.      Upon information and belief, at all times hereinafter mentioned, Defendant Skidmore College is a private, liberal arts college and a domestic non-profit corporation incorporated in New York, with its principal place of business located at 815 N. Broadway, Saratoga Springs, NY 12866.

9.      At all times hereinafter mentioned, during the 2015-2019 academic years, the United States Department of Education ("ED") distributed financial support to public and private colleges and universities for students attending their schools. Upon information and belief, Defendant Skidmore was a recipient of such federal funding.

## BACKGROUND

10.      This case arises amidst a growing national controversy stemming from the Department of Education's Office of Civil Rights ("OCR") threats to withhold federal education dollars in order to compel colleges and universities to aggressively address sexual assault and harassment on campus.

11.      OCR's threatened withholding of federal funds puts great pressure on Defendant and other colleges and universities to treat male students accused of sexual misconduct with a presumption of guilt and to simply punish the male student in order

to avoid jeopardizing the flow of taxpayer dollars, under the guise of making campuses safe for female students.

12.     The issue of sexual assaults on college and College campuses is primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.  Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.  The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.[1]  A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations.

13.     The use of Title IX in "campus rape" issues is regulated by the OCR's 2011 so-called Dear Colleague Letter that is subject to the following changes proposed in 2017:

- Removing the requirement that findings of fact and conclusions must be reached by applying a preponderance of the evidence standard and allowing institutions to decide whether to apply the more likely than not preponderance standard or the highly probable clear and convincing evidence standard;

- Making it clear that the burden is on the institution, and not on either party, to gather sufficient evidence to reach a fair and impartial determination as to whether sexual misconduct has occurred.

14.     As detailed below, for years, Defendant along with other universities were under federal scrutiny for alleged indifference to sexual violence on campus in violation

---

[1] 20 U.S.C. §§ 1681(a), 1687.

of Title IX, and for violations of the Clery Act, which requires colleges to keep and disclose information about crime on and near their respective campuses. Title IX compliance is monitored in part by the ED which can impose civil penalties and can suspend institutions from participating in federal student aid programs.

15.     Upon information and belief, Defendant's violations of Plaintiff's rights occurred in part because of threats by the federal government that colleges and universities could lose federal funding or face other adverse consequences for not finding male students like Plaintiff responsible for sexually assaulting female students.  Evidence of this pressure includes but is not limited to, the White House's April 2014 report entitled "Not Alone", which encouraged schools to combat sexual assault of women on campuses and warned that if colleges do not adhere to Title IX, they "risk[] losing federal funds" and/or face potential lawsuits filed by the Department of Justice."

16.     Skidmore has also made itself vulnerable to student pressure:  In March 2015, Skidmore extended the suspension of a student accused of sexual assault by two years and denied him access to campus even though his original sanction had expired. Skidmore added two more years to this male student's suspension in response to campus protests organized by the female accuser whose philosophy of punishment demanded expulsion and no return to campus for students found responsible of sexual misconduct. Skidmore's accommodated the accuser and the protesters indicates its willingness to follow campus trends rather than contractual obligations.

## STATEMENT OF THE FACTS

17.     In the Fall of 2018 Plaintiff began his senior year at Skidmore eager to gain his degree and graduate.  Pursuant to Skidmore's policies, Plaintiff had matriculated at

Skidmore, properly registered and paid for the necessary courses and credits to complete his degree.

18.     During his freshman year Plaintiff met Jane Doe,[2] a former student at Skidmore, and the two began an interpersonal and sexual relationship.

19.     Plaintiff and Jane Doe engaged in sexual relations on a regular basis, discussing the parameters of the relationship as it grew, including their eventual decision not to use a condom during sex.

20.     At or near the end of October 2015, Jane Doe had a fight with her roommate and spent the night in Plaintiff's room.  The next morning, after Plaintiff's roommate left, the two had sex, talked and, in due course, Jane Doe left.

21.     Shortly after Plaintiff and Jane Doe ended their relationship later during his freshman year, Jane argued with Plaintiff about him seeing other people.  They continued to see each other in class and remained cordial for the rest of the school year.

**First Title IX Action (Title IX 1)**

22.      In the Fall of 2018, Plaintiff began his senior year at Skidmore College.

23.     While attending a party in the early Fall, Plaintiff met Sue Roe around 11:30p.m. that evening.  Plaintiff was unaware at that moment that Sue Roe had been drinking since 8:30p.m. and had ingested cocaine earlier in the evening.  Plaintiff had no prior experience socializing with Sue Roe and did not encounter Sue Roe until around 11:30. He had no basis to determine to what extent her drug and alcohol consumption may have altered her behavior.

---

[2] To protect student privacy, Plaintiff is using pseudonyms for all Skidmore students and former students and will provide the proper names to Defendant in a separate document.

24.     Soon after Plaintiff joined Sue Roe and her friends, he invited everyone to his apartment.  Plaintiff observed Sue Roe run on the way to his apartment.  Her behavior evidenced a balanced and proficient gait, as well as enthusiasm for the task at hand to arrive to Plaintiff's apartment.

25.     At Plaintiff's apartment, Sue Roe conversed with Plaintiff about having been a counselor at a summer camp and about having sex with other counselors.  She invited Plaintiff to become a counselor.  Plaintiff observed that Sue Roe was coherent, proficient in speech, and able to effectively engage in conversation.  Also, given that she was also aware that Plaintiff had expressed an interest in her, her choice of anecdote and expressed interest in his becoming a counselor at her summer camp reasonably indicated to Plaintiff that she was also interested in him.

26.     Soon after this conversation, the opportunity arose for  Plaintiff's guests to go upstairs to the bedroom of one of the Plaintiff's roommates to look at a new computer he had built.  Sue Roe ably climbed the steep 18-step staircase to the second story.

27.     After Sue Roe went upstairs with her friends, she and Plaintiff stayed behind when everyone else returned downstairs.  While many of Sue Roe's friends reported that they were aware that she did not return downstairs with them, none of them expressed any concern that she may be incapacitated and no one acted to chaperone the couple or intervene in any way.

28.     After talking and flirting for a few minutes in which Plaintiff and Sue expressed attraction to the other, Plaintiff and Sue Roe commenced kissing in his roommate's bedroom.  Plaintiff recommended they move to his bedroom and Sue Roe willingly joined him.  In Plaintiff's bedroom, Plaintiff saw Sue Roe energetically jump on his bed and Plaintiff followed her lead and jumped on the bed as well.

29.     Plaintiff also observed Sue Roe removing all of her clothing herself, including her pierced earrings, before he undressed.

30.     While they were engaged in sex, Sue Roe made the sounds of enjoyment and later stated that she could feel that he wasn't wearing a condom, but made no objections, and afterwards the two cuddled.

31.     Sue Roe then got dressed and went downstairs (unassisted) where she located her friends on the couch and joined them.  Sue Roe and her friends stayed a while longer and then left.

32.     Several weeks later, Plaintiff received a notice from Defendant that a complaint was filed by Sue Roe alleging violations of sexual misconduct against Plaintiff.

33.     Plaintiff was immediately issued an order to stay away from Sue Roe, and although he had earned sufficient credits to graduate and had already been accepted to graduate program, he was suspended from receiving his diploma for three (3) years.

34.     Moreover, even though the suspension occurred only weeks before graduation, Skidmore prohibited Plaintiff from completing the three (3) courses in which he was enrolled and he was given F's and denied credits for two of these courses with no opportunity to complete or re-take these courses.

35.     Notably, while some of Plaintiff's coursework was due on or before the date of his suspension in connection with Title IX 1 on April 23, 2019, other assignments were due later in the semester and/or his instructors gave Plaintiff the option to turn in assignments after his suspension.

36.     Nevertheless, Defendant refused to accept assignments past April 23, 2019, when he was suspended.

37.     But for the suspension and pursuant to Defendant's policies and customs in connection with incomplete coursework for graduating senior, Plaintiff would have been allowed submit his coursework timely or at least take an incomplete in lieu of a failing grade.  Instead, Defendant forced Plaintiff into failing two of the three courses he needed to complete his degree program.

38.     Moreover, as part of Plaintiff's sanction, Skidmore will not allow Plaintiff to complete (and/or retake) these two courses at Skidmore.

39.     The consequence of this prohibition is a Catch-22:  To complete his degree, Plaintiff must take two courses at another school and transfer those credits to Skidmore.  However, other schools will not allow a transfer student to take senior level courses that Skidmore would accept as transfer credits without matriculating in a degree program.  To officially matriculate in a degree program in a new school, Plaintiff would have to repeat upwards to two-years of credits.  This is a draconian cost of time and money, and compounds the unwarranted sanction against Plaintiff punitively and *in extremis*.

**Second Title IX Action (Title IX 2)**

40.     Shortly after receiving the gender biased decision from Skidmore, Plaintiff, received a notice from Defendant that a complaint was filed by Jane Doe, Plaintiff's girlfriend from his freshman year—three (3) years prior—alleging violations of sexual misconduct against Plaintiff. The complaint stated that while Plaintiff and Jane Doe were engaged in a consensual sexual relationship during his Freshman year, having sex 3 to 5 times a week over the course of approximately 5 weeks, she was coerced into:

- Performing oral sex

- Having sex without the use of a condom

- Non-consensual sex the morning after she spent the night in his room

**Jane Doe's Complaint**

41.    Jane Doe states that although she consensually participated in sex with Plaintiff at least three (3) times a week, she wanted to use a condom and had condoms in her room.  However, 9 out of 10 times she would sexually engage Plaintiff in his room, where there were no condoms, nor did she bring condoms with her.

42.    Jane Doe further stated that she did not want to engage in oral sex but would do so because Plaintiff would say "please", so she felt coerced and complied.[3]

43.    Jane Doe further stated that she did not consent to having sex with me the morning after she spent the night (as described herein). Instead, she stated that I asked her to have sex, and she stated no. However, she woke me up saying she changed her mind. Then, she put on her clothes, after which we talked and she eventually left.  In another encounter, she claimed that I coerced her into sex because I "pouted and said please" repeatedly until she said yes, then she laid there while I performed sex.

44.    Three years later, just before Plaintiff was to graduate, Jane Doe filed her complaint.

**Investigation**

45.    During the investigation, Jenna Jones and Sadie Smith (both pseudonyms), the two students Jane Doe identified as witnesses whom she told what happened during her 2015 freshman year at Skidmore alleging that Plaintiff had raped her, were questioned.  Jenna said that, in 2015, Sue told her that she and Plaintiff broke up because he had cheated on her.  But then in 2016, while Jane was attending a different school,

---

[3] Jane Doe does not state that she objected after Plaintiff said "'please" nor that he made any adverse threats.  However, his polite request apparently caused her to feel coerced.

Jane told her that Plaintiff had assaulted her. Sadie stated that she doesn't recall Sue telling her anything at all about an assault.

46. During the investigation Jane Doe also identified three (3) additional individuals—her two (2) roommates and Plaintiff's roommate—but admitted that she did not speak with her roommates regarding her relationship with Plaintiff and did not believe that Plaintiff's roommate had any knowledge. As such, they were not interviewed.

**Determination—Title IX 1**

47. After a hearing, Defendant determined that there was sufficient evidence to support the allegation that there was a violation of sexual misconduct policy by Plaintiff towards Sue Roe. Plaintiff received a three (3) year suspension and was banned from campus.

**Determination—Title IX 2**

48. After a hearing, Defendant determined that, while there was no finding of coercion, there was sufficient evidence to support the allegation that there was a violation of sexual misconduct policy by Plaintiff towards Jane Doe. Plaintiff received a two (2) year suspension and was banned from campus to commence after the three (3) year suspension imposed in connection with the Title IX 1 determination.

49. Plaintiff's combined sanctions prohibit him from receiving his earned degree until 2024.

**Plaintiff's Appeal**

50. Plaintiff appealed and argued that, because the first Title IX case regarding Sue was disclosed to the panel, there was material deviation from established procedures and error in the application of policy along with an substantiated bias in the investigation, hearing and determination.

51.     Further, Plaintiff argued that the hearing panel gave a presumption of truth to the statements and alleged facts presented by Jane Doe and Sue Roe and their presented witnesses and put the burden on him to have to prove the truthfulness of his statements.

52.     On appeal, Defendant Skidmore upheld the Title IX 1 determination of a three (3) year suspension and modified the Title IX 2 determination, reducing the suspension to one (1) year, further determining that it should run concurrent with the Title IX 1 three (3) year suspension.  After appeal, Plaintiff will not receive his earned degree until May 31, 2022.

**Skidmore's Sexual Misconduct Policy And Procedure**

53.     In its March 6, 2019 Panel Decision (sanction modified on March 22, 2019, collectively, the "Decision"), Skidmore found Plaintiff responsible for engaging in sexual activity with Sue Roe without her consent as a result of her "incapacitation."  Whereas it appears that Sue and Plaintiff were both intoxicated, both Plaintiff and Sue provided ample evidence that he had no reasonable basis to believe that she was inebriated to the point of incapacitation.  Indeed, Sue, by her own testimony (and actions) established that she was inebriated but not incapacitated during the time she and Plaintiff were in each other's company—she exhibited fine motor skills by disrobing herself and removing her earrings and was an active participant in the sexual encounter.  As such, her consent was given non-verbally.

54.     In accordance with Defendant Skidmore's Policy and Procedure, Incapacitation is defined as:

> Where alcohol or other drugs are involved, incapacitation is a state beyond drunkenness or intoxication, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity.  Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other

intoxicants may be incapacitated and therefore unable to consent. The impact of alcohol and other drugs varies from person to person; however, warning signs that a person may be approaching incapacitation may include slurred speech, vomiting, unsteady gait, odor of alcohol, combativeness, or emotional volatility.

*Incapacitation Standard, Policy, pp. 19-20:*

Evaluating incapacitation requires an assessment of how the consumption of

alcohol and/or drugs affects an individual's:

> Decision-making ability;
> Awareness of consequences;
> Ability to make informed judgments;
> Capacity to appreciate the nature and the quality of the act; and/or
> Level of consciousness.

> *Id*.

In other words, a person may be considered unable to give affirmative consent due

to incapacitation if the person cannot understand who, what, where, when, why, or how,

with respect to the sexual interaction.

55.     Skidmore's policy defines incapacitation as follows:

> Incapacitation: a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the "who, what, when, where, why or how" of their sexual interaction) . . . Incapacitation can also occur because of an individual's physical or mental condition or disability that impairs the individual's ability to provide consent. Incapacitation as a result of a physical or mental condition includes, but is not limited to, being: (i) asleep or in a state of unconsciousness; (ii) physically helpless; or (iii) involuntarily restrained. Depending on the degree of intoxication, someone who is under the influence of alcohol or drugs may be incapacitated and unable to consent to sexual activity. *Being drunk or intoxicated, however, does not necessarily render someone incapacitated.* The impact of alcohol or drugs varies from person to person. Whether sexual activity with an incapacitated person constitutes gender-based misconduct depends on whether the Responding Student knew or should have known of the Reporting Individual's incapacitation. The question of what a Responding Student knew or should have known is objectively based on what a reasonable person in the place of the Responding Student,

sober and exercising good judgment, would have known about the condition of the Reporting Individual.

*Definition of Incapacitation (in relevant part), Policy, p. 10, emphasis added.*

56.     Skidmore's Policy clearly distinguishes intoxication from incapacitation. Moreover, Skidmore's Policy does not prohibit sexual engagement with an intoxicated person.  Yet, in practice, Skidmore impermissibly equates intoxication with incapacitation and impermissibly prohibits sexual engagement with an intoxicated person.   Such practices breach Skidmore's policies.

57.     Skidmore's practices are also not in accord with the Association of Title IX Administrators, which also distinguishes between intoxication and incapacitation as follows:

> A common policy problem comes from failing to distinguish between intoxicated and incapacitated . . . the key is that the respondent's culpability rests on two factors, the incapacitation of the victim and his knowledge of that incapacitation, whether actual or constructive.
>
> Brett A. Sokolow, J.D., ATIXA Executive Director, ATIXA Tip of the Week Newsletter, *Sex and Booze,* April 24, 2014.

58.     As such, incapacitation cannot be determined by the Decision's decree. Pursuant to the Policy and New York's *Enough is Enough Law* Art. 129-B, NY CLS Educ. §6443 *et seq*., such determination requires a fair and impartial assessment of whether Plaintiff should have been aware of Sue's incapacitation based on objectively and reasonably apparent indicators of impairment when viewed from the perspective of a sober, reasonable person in his position.

**Burden of Proof**

59.     Plaintiff has no burden of proof to establish his compliance with the Policy. The only party who has any burden of proof is Skidmore.  Yet Skidmore neglected its role and foisted the burden entirely on Plaintiff.  As such, Skidmore's policies and practices are not in compliance with New York State's *Enough is Enough law,* Art. 129-B 6444(5)(c)(ii) that requires that all New York universities and colleges acknowledge "the rights of the respondent, including *the right to a presumption that the respondent is 'not responsible' until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures* [*emphasis added*].

60.     Moreover, The Art. 129-B Guidelines explains the presumption with respect to the respondent's rights pursuant to Art. 129-B 6444(5)(c)(ii) as follows:

> The Respondent "should not be determined in advance to have violated a rule and then required to 'prove a negative.' To borrow a phrase from the criminal justice process, one is 'innocent until proven guilty.'  This law, consistent with that principle, emphasizes that a respondent is presumed to be 'not responsible' until the institution has established evidence**,** testimony or information that would allow the decision maker to find the respondent responsible pursuant to the institution code of conduct and this law.  *Note that the burden is on the institution to develop these facts, not on the reporting individual***,** who may participate at the level to which he or she is comfortable.   Through the process, appropriate officials may listen to witnesses and review available evidence to make a determination, to the best of their ability, whether it is more likely than not that a policy violation occurred.  *For example, an institution cannot begin a process with the presumption that a respondent engaged in sex without consent, and then begin to gather evidence wherein the respondent would have to prove there was consent. The institution should gather evidence to determine whether a violation occurred and the burden of such a finding is on the institution [emphasis added].*"

61.     Skidmore impermissibly began its process with the presumption that Plaintiff was the initiator.  This is apparent in the record as Skidmore did not address the

issue of initiation and made no finding of fact that Plaintiff was the initiator.

62.     As such, Skidmore wrongly imposed a standard of liability on Plaintiff based solely on his capacity as the student Sue complained against.  This is not a fair and impartial standard.  Instead, it is a standard that relies on sleight-of-hand to characterize the responding student as the initiator and therefore the party responsible for consent. Given that the majority of responding students are male and the majority of reporting students are female, Skidmore's Policy impermissibly puts its male students in the unfair and stereotypically discriminatory role as the sexual aggressor and initiator of sex and at the same time the presumed protector of his female partner.

63.     Indeed, Skidmore's Policy does not require that the responding student have *mens rea*, or a motive for his actions.  Regardless, Skidmore wrongly manufactured intent based on sexual stereotypes and identified Plaintiff as a predator who plied Sue with alcohol.  The opposite is true:  Sue consumed drugs and alcohol by her own volition throughout the evening.  Further, at Plaintiff's apartment, Plaintiff observed Sue go through his cabinets uninvited looking for alcohol, which she admitted to having done.

64.     An unwarranted sexual encounter based on incapacitation is solely judged on the objective/reasonable/sober standard, not on whether the student had any intent whatsoever.  The failure to obtain affirmative consent could be merely unintentional negligence, perhaps because of the responding student's own inebriation, or a misunderstanding on who was the initiator.  In any event, the Policy does not require a finding of motive or intent, and Skidmore's overreaching effort to fabricate one regardless of the record is a particularly malicious and offensive mismanagement of the investigation.

65.     Skidmore's actions are all the more egregious given that Sue's credibility was compromised by intentional deceit.  Given Sue's presence of mind and capacity, it is curious that she forgot to disclose to the investigator that she took cocaine earlier in the evening, especially since she initiated the cocaine use with a text to her friends—"let's do drugs."  She did not forget the cocaine; she was covering it up.  Sue continued to conveniently misremember facts and easily manipulate narratives.  She does not remember discussing birth control with Plaintiff for example, but he had information about her birth control and STD testing that was verified by her own evidence.  Yet she remembered the next morning that she had sex with Plaintiff and immediately strategized to cover it up so her then-current boyfriend would not find out.

66.     Skidmore is in violation of its own policy and New York's Enough is Enough Law, and despite the overwhelming factual evidence and information to the contrary, Defendant Skidmore chose to rule against Plaintiff.

## CAUSES OF ACTION

### COUNT I
### 20 U.S.C. § 1681 *et seq*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### Hostile Education Environment/Sexual Harassment

67.     Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

68.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

69.     Defendant receives federal financial assistance.

70.     Plaintiff's gender is protected by Title IX.

71.     During the events herein, Plaintiff matriculated as a student in attendance at Skidmore College.

72.      Plaintiff was subject to harassment from Sue Roe and Jane Doe through planning, scheming, plotting and filing false allegations against him for the purpose of causing him injury.

73.     Sue Roe and Jane Doe's harassment was sufficiently severe and/or pervasive to alter the condition of Plaintiff's education and created an abusive educational environment for Plaintiff and constitutes a continuing violation.

74.     Skidmore's representatives were aware of the false, retaliatory and harassing complaints filed against Plaintiff and failed to adequately respond to or address the harassment.  Indeed, Skidmore's representatives acted with deliberate indifference with respect to the harassment of Plaintiff even as the Title IX coordinator contacted a close friend and a girlfriend of Plaintiff's about an instance in a Gender Studies class in which the instructor encouraged students to make protest-style posters against Plaintiff and calling for his punishment and removal from campus without graduating, and in which Sue Roe's friends confronted Plaintiff's girlfriend to discourage her from dating Plaintiff.

75.     Such actions by these students and the instructor in this course is a clear breach of Skidmore's confidentiality provisions which aim to protect the identities of parties to a Title IX action.  It also breaches Skidmore's prohibition against retaliation as these actions were intended to cause harm to Plaintiff by condemning him in public and interfering in his personal life.

76.     Skidmore's conduct as set forth herein was in violation of Title IX's strictures against harassment and Skidmore is liable to Plaintiff.  Interestingly, when Plaintiff sought counseling at Skidmore's Counseling Center in connection with the extreme emotional distress he was enduring, he found that Skidmore's Counseling Center was not neutral and that the receptionist at the Counseling Center was also a liaison between Skidmore's Title IX office and the dean.  As a result, Plaintiff wound up with no counseling from Skidmore.  On information and belief, female students who report Title IX violations and seek counseling face no such conflict of interest.

77.     Indeed, whereas Skidmore has the right and does initiate Title IX disciplinary actions on behalf of alleged female victims of sexual harassment, Skidmore did not bring an action against Sue Roe and Jane Doe on Plaintiff's behalf.

78.     Plaintiff became the subject of anonymous online messages saying lewd things about him.  Skidmore's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and Skidmore is liable to Plaintiff.

79.     By reason of the sexual harassment, Plaintiff has suffered and continues to suffer extreme emotional distress and damage to his reputation and Plaintiff is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs.

80.     Based upon the foregoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

81.     By reason of the foregoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**COUNT II**
**20 U.S.C. § 1681 *et seq*.**
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Gender Discrimination**

82.     Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

83.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:  No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

84.     Defendant receives federal financial assistance.

85.     Plaintiff's gender is protected by Title IX and, during the events herein, Plaintiff was a student at Skidmore.

86.     Defendant discriminated against Plaintiff by permitting a pattern or practice of gender discrimination against him in violation of Title IX as set forth herein.

87.     Such pattern or practice constitutes a continuing violation and Skidmore is liable to Plaintiff from October 2018 to the present date—the Relevant Time Period.

88.     Plaintiff, Sue Roe and Jane Doe were similarly situated in that they alleged harassment by the other in violation of Skidmore's Title IX Policy.

89.     Skidmore's indifference adversely affected Plaintiff as he was vulnerable to: a) a subsequent investigation; b) a protective order limiting his access to campus; c) a sanction that is not only a cloud on his academic record, but because there was a pre-existing claim and NCO the further claims made him vulnerable to more severe sanctions; d) a second investigation; e) immediate and unwarranted separation from campus; and f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule.

90.     Skidmore was also deliberately indifferent to Plaintiff's claims that it gave credibility to the Reporting Individuals, Sue Roe and Jane Doe, and discredited his statements and facts.  Moreover, Skidmore judged Plaintiff according to antiquated gender stereotypes.

91.     In each instance, the alleged conduct was not witnessed and Skidmore gave no weight to the surrounding facts and circumstances in accordance with its policies in basing its decision that the statements of Sue and Jane were credible and that Plaintiff's statements were not.

92.     Skidmore seized the opportunity to bring actions against Plaintiff based on the allegations of Sue and Jane that were in contrast with its policies and procedures and violated the Code's prohibition to not misrepresent information during the Title IX action.

93.     By bringing an action against Plaintiff, he was adversely affected and denied his degree and immediate future opportunities.

94.     Skidmore discriminated against Plaintiff's gender and detrimentally and adversely affected Plaintiff's education because he is male.

95.    Defendant's gender discrimination was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

96.    As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has suffered extreme emotional distress, mental anguish, humiliation and embarrassment and damage to his reputation.

97.    Based upon the foregoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

98.    By reason of the foregoing, Plaintiff is entitled to all legal and equitable remedies available, including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**COUNT III**
**20 U.S.C. § 1681 *et seq.***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Erroneous Outcome**

99.    Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

100.    In Title IX 2, Skidmore engaged in a series of actions that ultimately resulted in a suspension order against Plaintiff based on a manufactured complaint from Sue Roe and a retaliatory complaint from Jane Doe.

101.    The erroneous outcome of ordering Plaintiff's suspension and separation from campus after he had achieved the necessary credits to graduate was caused in substantial part by gender bias against Plaintiff.  This gender bias is reflected in the patterns of decision making and procedural missteps demonstrated by Skidmore throughout the entire investigative process, which among other things, judged Plaintiff, Jane and Sue according to antiquated gender stereotypes.

102.    Skidmore's gender bias caused such erroneous outcomes as:  a) a protective order limiting Plaintiff's access to campus; b) a sanction that is not only a cloud on his academic record, but as a pre-existing complaint made him vulnerable to further sanctions; d) multiple investigations; e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

103.    Skidmore's violations of its obligations under Title IX proximately caused Plaintiff to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

104.    Plaintiff is entitled to damages (compensatory and punitive as well as attorney's fees) for the harm he suffered as a result of Skidmore's violation of its Title IX obligations.

**COUNT IV**
**20 U.S.C. § 1681 *et seq*.**

## TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
## Selective Enforcement

105.    Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

106.    Defendant exhibited patterns and practices of decision-making that show that the penalties Plaintiff endured and the very decisions to initiate Title IX 2 against him, as well as the decision to not initiate a Title IX action against Sue or Jane, were motivated by Skidmore's pattern or practice of intentional animus against Plaintiff's gender, which among other things, led to findings based on antiquated gender stereotypes.

107.    Plaintiff, Sue Roe and Jane Doe were similarly situated in that Skidmore was aware that Sue violated Skidmore's Title IX Sexual Misconduct Policy.  However, Skidmore encouraged and endorsed Sue's claims against Plaintiff, and discouraged and did not endorse Plaintiff to bring a claim against Sue.

108.    As indicated by the Title IX actions, Skidmore is on alert and willing to bring a disciplinary action on behalf of a female student against a male student, but not willing to bring a disciplinary action on behalf of a male student against a female student even if the male student alleges policy violations similar to the allegations asserted by the female student, as Sue's allegations were false and thereby violated Defendant's policy.

109.    As indicated, Skidmore is on the alert and willing to bring a disciplinary action against a male student even when the female accuser's allegations are contradictory and retaliatory, but Skidmore is unwilling to bring a disciplinary action

24

against a female student even when the male accuser is willing to participate and is being injured as a result of the false allegations.

110.    Skidmore's selective enforcement affected Plaintiff as he was vulnerable to:  a) a subsequent investigation; b) a protective order limiting his access to campus; c) a sanction that is not only a cloud on his academic record; d) a second investigation, e) immediate and unwarranted separation from campus; f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule; and g) threats of disciplinary action based on alleged violations of the no contact order.

111.    Skidmore was also deliberately indifferent to Plaintiff's claims that Sue and Jane:  a) breached their duty to uphold the confidentiality of the proceeding by spreading misandristic rumors about Plaintiff and among other things calling him a sexual predator and a danger to the Skidmore community; b) violated the Code's prohibition to not misrepresent information and lie during the Title IX actions. Skidmore was also deliberately indifferent to the acts of retaliation causing harm to Plaintiff's reputation and well-being.

112.    Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential and selective treatment Plaintiff and Sue and Jane received in that, among other things, Sue and Jane alleged conclusory, false and unsubstantiated claims to which Plaintiff was prohibited to respond.

113.    Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential and selective treatment he and Sue and Jane received in that, among other things, Defendant could not attribute a negative motive to Sue and Jane but determined that by virtue of being accused, Plaintiff could not be presumed innocent, but instead was presumed responsible.

114.    Skidmore exhibited intentional and substantial gender bias when it failed to prosecute Sue and Jane (and/or at least censure the former student) for their actions against Plaintiff through false allegations of sexual violations against themselves and others.

115.    Based upon the foregoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress and loss of capacity for the enjoyment of life.

116.    By reason of the foregoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## COUNT V
## Covenant of Good Faith and Fair Dealing

117.    Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

118.    Based on the aforementioned facts and circumstances, Skidmore breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by ordering his separation from the College based on false and baseless complaints and the clearly improper application of the intoxication/incapacitation policy resulting a presumption of guilt against the

accused.

119.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

120.     Plaintiff is entitled to recover damages for Skidmore's breach of the express and/or implied contractual obligations described above.

121.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI

## BREACH OF CONTRACT

122.     Plaintiff repeats the allegations made in the preceding paragraphs and incorporates those allegations by reference with the same force and effect as if herein set forth.

123.     Skidmore's Code of Conduct and Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the ("Policy") represents a contractual commitment to its students.

124.     Plaintiff matriculated at Skidmore and at all relevant times relied on the Code and Policies.

**Breach of Policy**

125.     In particular, Plaintiff relied on Skidmore's duty as set for in the Policy to "not discriminate on the basis of sex, race, color...[and]...disability, in the administration of its educational policies or other school administered programs."

126.     Skidmore violated this Policy provision by granting preference and

credibility to the complaints, allegations and statements of female students, Sue and Jane, each of whom was similarly situated to Plaintiff as set forth herein, but for their gender.

127.    As a result, Sue and Jane—female students—had access to the Policy's full procedural process for Title IX violations, yet Skidmore did not grant Plaintiff—a male student—the same rights under the Policy.

**Breach of Code of Conduct**

128.    Further, Skidmore breached the Code's prohibition of "[l]ying or materially misrepresenting information to an official College body or officer, including a member of the Department of Public Safety."  The Code states that "[l]ying in the course of a student conduct hearing constitutes an offense that is immediately actionable."

129.    Sue and Jane asserted a number of misrepresentations and presented them to Skidmore during the Title IX investigations.  Even though these statements were contradictory, and hearsay, Skidmore did not exclude them from the investigative report.  Further, Sue and Jane continued to misrepresent their experiences with Plaintiff at the hearing, yet Skidmore took no action against Sue and Jane whatsoever immediately or otherwise.  Sue and Jane asserted a number of misrepresentations that were memorialized and presented to Skidmore during the Title IX investigations.

**Breach of Covenant to Uphold Individual Integrity**

130.    Skidmore's policy on individual integrity requires that members of the Skidmore community will be truthful and forthright as set forth in its Code of Conduct.  Skidmore expects that community members will not engage in behavior

that has serious ramifications for the safety, welfare, academic well-being, or professional obligations of others.

131.    In committing egregious violations of Plaintiff's rights during the issuance of a separation order and suspension, Skidmore violated the policies of the Code of Conduct.

132.    Skidmore's failure to hold Sue and Jane accountable for individual integrity breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

**Breach Of Procedural Rights In Connection With Title IX**

133.    According to the Code, Skidmore's authority to separate a student from the College is limited to instances where the student "pose[s] a danger to themselves or the immediate well-being of the College community."

134.    Skidmore's March 6, 2019 suspension order to Plaintiff was not based on an actual facts, but was instead based on the failure to follow policy and procedure with the presumption of credibility given to the reporting individual and the placement of a burden to prove innocence on the respondent.

135.    Skidmore has deprived Plaintiff of his contractual rights to due process and equal protection through the improper administration of the student suspension order process in violation of Skidmore's guidelines and regulations.

136.    As set forth in its Title IX Complaint Process, Skidmore also breached its obligation to "ordinarily complete its investigation and disciplinary process, fairly and in accordance with policy."  Skidmore did not apply its own policies and procedures during the investigation or hearing.

137.    The Skidmore College Code of Conduct sets forth "Student Rights and

Responsibilities," which list confers upon students the right "[t]o be treated fairly."

138.    As set forth in its Title IX Complaint Process, Skidmore also breached its obligation to apply its policies and procedures fairly, which based on the statements and facts evidenced in the hearing, it did not.

139.    Further, Defendant breached and/or tolerated Jane and Sue and other third-party students' breaches of Skidmore's confidentiality and retaliation provisions.

## Skidmore's Breach of Plaintiff's Contractual Rights Caused Damage

140.    In committing egregious violations of Plaintiff's rights during Title IX 1 and Title IX 2 by, among other things, issuing a suspension order and the inherent racism and/or sexism inherent Skidmore's actions throughout the Relevant Time Period, Skidmore violated the policies of the Code and degraded, weakened and breached the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

141.    Skidmore agreed to allow its community members to live in a discrimination-free and harassment-free environment as stated in its Code, p.3.

142.    Skidmore committed numerous investigative and procedural missteps and harbored an overall institutional gender bias against Plaintiff, as a male student, accused of sexual misconduct during his student conduct proceeding, all of which led to the erroneous separation order.

143.    Skidmore's discrimination of Plaintiff, on the basis of his male gender and in breach of its own policies, guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

144.    Most egregiously, Skidmore breached its implied contract with Plaintiff

in connection with his matriculation in courses for which he paid for and completed and/or all but completed but for the calamitous events in connection with the two Title IX procedures occurring in the last phases of his last semester at Skidmore prior to his graduation.  Instead of allowing Plaintiff to complete his classwork, and/or allowing him to take an incomplete or in any respect allowing him to earn the credits for his degree, Skidmore's conduct left Plaintiff with failing marks in courses for which he sufficiently completed (or was willing and able to sufficiently complete) all work.

145.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Plaintiff demands the following relief against Defendant Skidmore College:

a.    An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

b.     If warranted by the evidence, punitive damages;

c.    An injunction prohibiting Skidmore College from taking any further action against Plaintiff with regard to the events described herein;

d.    An expungement of all records in Plaintiff's academic file in connection with Title IX 1 and Title IX 2;

e.    Attorney's fees and costs pursuant to Title IX, Title VI and  42 USCS §

1988;

f.    For such other and further relief as this Court may deem appropriate and

equitable, including injunctive and declaratory relief as may be required in

the interest of justice.

Dated: New York, New York
        January 2, 2020


                              THE KAPLAN LAW OFFICE
                              /s/
                              _____

                              Charles Caranicas, Esq.
                              *Attorney for Plaintiff—John Doe*
                              30 Wall Street, 8th Fl.
                              New York, New York 10005
                              347.683.2505
                              Skaplan@Lawkaplan.com